CARTER *v.* MARVEL CARBURETOR CO.

CONTRACTS—PATENTS—ROYALTIES—ACCOUNTING.

> In suit for accounting for royalties alleged to be due plaintiff under contract with defendant for exclusive use of patents in manufacturing carburetors, decree denying plaintiff's right to unearned minimum royalties, but awarding him certain sum as royalties on carburetors sold, is affirmed, on appeal by both parties, by equally divided court.

Appeal from Genesee; Black (Edward D.), J. Submitted January 6, 1933. (Docket No. 48, Calendar No. 36,935.) Decided May 16, 1933. Rehearing denied June 29, 1933.

Bill by William C. Carter against Marvel Carburetor Company, an Indiana corporation, for cancellation of patent license agreement, an accounting, and injunctive relief. From decree rendered, both parties appeal. Affirmed by an equally divided court.

*Withey & Trobert,* for plaintiff.

*Clark, Klein, Ferris & Cook,* for defendant.

SHARPE, J. The plaintiff, a former resident of St. Louis, Missouri, and engaged in the invention of automobile accessories, came to the city of Flint in 1923 at the request of the defendant, and entered into a contract with it on November 21st of that year, which is the subject of this litigation. As decision rests upon the construction which shall be

placed upon so many of its provisions, it will be inserted in full in the margin hereto.*

* *"License Agreement*

"WHEREAS, William C. Carter, of St. Louis, Missouri, party of first part, is the inventor of certain useful and valuable inventions in the art of carburetor designs, which device are suitable to be used in connection with internal combustion engines; some of which said inventions are now in application for patent in the United States patent office, and still other like inventions which may be entered in the United States patent office for application for patent, and

"WHEREAS, said party of the first part is also the inventor of certain forms of fuel supply apparatus used in connection with internal combustion engines, and

"WHEREAS, said party of the first part is the owner of certain United States letters patents covering certain designs of said fuel supply apparatus and is the owner of certain applications for letters patent in the United States patent office, relating to like devices, and is likewise the inventor and owner of certain other designs relating to said fuel supply apparatus which may be placed in United States patent office for letters patent, and

"WHEREAS, the Marvel Carburetor Company, a corporation incorporated under the laws of the State of Indiana and having its office and factory in Flint, Genesee county, Michigan, party of the second part, is desirous of becoming interested in the development, manufacture and sale of the devices referred to of the party of the first part, it is hereby mutually agreed between said parties as follows:

"1. Party of the second part hereby agrees to employ party of the first part at a salary of $300 per month for a period of one year or less at its option provided that party of the second part shall give party of the first part 30 days' notice of its desire to so cancel such employment and this agreement in which event such employment shall cease and this agreement thereby become null and void; in consideration of which party of the first part hereby agrees to grant said party of the second part the exclusive right to manufacture and sell all articles, both carburetors and fuel supply systems which may come under any of his described patents, patent applications which may hereafter issue, or applications for patents which may hereafter be made by him when same shall have been issued, provided, however, that said exclusive license shall be operative to party of the second part so long only as it shall continue to pay to party of the first part the minimum sums as hereinafter described.

"2. If party of the second part shall manufacture any carburetors under said party of the first part's aforementioned patents, it agrees to pay party of the first part the sum of two per cent. of its selling price per instrument as royalty on same and hereby agrees that said royalty shall not be less per instrument than the minimum sum of five cents each.

"3. In the event that party of the second part shall elect to manufacture fuel supply apparatus under patents of the party of

Plaintiff entered into the employ of the defendant under this contract. It is his claim that such employment terminated at the end of the first year. It appears, however, that he continued to occupy a room in defendant's plant, set apart for him, until some time in 1931. In 1926 and 1927 he spent some time in perfecting an invention spoken of as a by-pass, it being a small device to be incorporated in a carburetor to control the flow of gasoline therein. It appears that Charles Kirby, an engineer in the employ of the defendant, was likewise working on a somewhat similar design. He claims that he had no knowledge of plaintiff's efforts along the same line. An application for a patent therefor was filed by Kirby on October 5th and by the plaintiff on October 17, 1927. Letters patent were issued to plaintiff on his application on November 10, 1931.

In July, 1928, the defendant began producing a carburetor containing, as plaintiff claims, his by-

the first part, it agrees to pay party of the first part the sum of two per cent. of its selling price per instrument so manufactured and sold and party of the second part hereby agrees that said royalty shall not be less than the minimum sum of five cents each.

"4. In the event that party of the second part shall manufacture an instrument in combination consisting of a carburetor and fuel supply apparatus wherein the carburetor is not of the design covered by patents by party of the first part, but wherein the fuel supply apparatus used should come under said party of the first part's patents, then in that event, party of the second part agrees to pay party of the first part a royalty per instrument in combination, of two per cent. of one-half of the amount of its selling price, but party of the second part further agrees that said royalty per instrument shall not be less than the minimum sum of five cents each.

"5. It is further agreed that in the event that party of the second part shall elect to retain the exclusive rights to manufacture and sell carburetors or fuel supply apparatus or both under the aforesaid patents of party of the first part, but not to employ party of the first part, then in that event, party of the second part shall pay party of the first part a minimum royalty for all rights under all of said patents of the sum of $300 per month payable monthly for a period of two years, it being understood that said sum shall be a guaranteed minimum sum as royalty for said exclusive rights and shall in no wise be taken into account in

pass device, and in that year and in 1929, 1930, and 1931 it sold to the Hudson-Essex Company approximately 484,938 of them at a specified price for each one.

In his bill of complaint plaintiff sought cancellation of the contract and the restraint of the defendant from operating under it, and an accounting for the royalties due him thereunder. The trial court found that the defendant had breached the contract, and, as the defendant stated in open court that it had no objection thereto, decreed its cancellation. He found that the plaintiff was not entitled to unearned minimum royalties as provided for in the fifth paragraph of the contract, but that he was entitled to recover royalties on the carburetors sold to the Hudson-Essex Company in the sum of $49,936.65, and gave him decree therefor. From this allowance the defendant has taken an appeal, and from the disallowance of his claim for unearned

the event that royalties as described in manufacture and sale shall amount to more than $300 per month. At the end of the second year and for the third year the said minimum royalty shall be $4,000, payable quarterly, at the end of the third year and for the fourth year, the said minimum royalty shall be $5,000 per year, payable quarterly, and the same sum yearly thereafter, so long as this agreement shall remain in force.

"6. It is understood that party of the second part may, at its option, cancel this agreement at any time, upon 30 days' notice to party of the first part of its desire to do so.

"7. It is understood that royalties per instrument, referring either to carburetors or to fuel supply apparatus, shall be based upon a unit of either in the design of which shall be embodied one or more claims of either or any of the patents of first party relating thereto.

"8. It is understood that carburetor patents referred to in the above have to do only with patents which may issue from the United States patent office upon application for patent by party of the first part filed in United States office after January 1, 1920.

"9. It is understood that fuel supply apparatus patents have to do with United States letters patent No. 1,191,061, filed December 7, 1914, and allowed July 11, 1916, and United States letters patent, No. 1,146,134, filed July 6, 1914, and allowed July 13, 1915, and United States letters patent No. 1,146,134, filed March 16, 1914, and allowed July 13, 1915, and United States application for

minimum royalties the plaintiff has taken a cross-appeal.

Paragraphs 1 and 2 of the contract contain specific provision for the exclusive use of plaintiff's patents by defendant and the royalty to be paid him therefor. Paragraph 1 also provides for the employment of plaintiff by defendant at $300 per month "for a period of one year or less at its option," provided it should give the plaintiff, "30 days' notice of its desire to so cancel such employment and this agreement in which event such employment shall cease and this agreement thereby become null and void." If this language be given a strict construction, and the hiring be limited to a period of one year, the contract was terminated at the end of that time. But the recitals and other

patent having serial No. 380,293, filed May 10, 1920, and all other applications for fuel supply apparatus which may now be in application in the United States patent office, or which may hereafter be applied for by party of the first part in United States patent office and issue.

"10. It is understood that royalties hereunder are to be based upon described patents already issued to party of the first part and aforesaid patent applications after same have issued.

"11. It is understood that party of the second part, under the terms hereunder, is to have the exclusive right to manufacture and sell under any and all patents covering carburetors or fuel supply apparatus, or improvements hereon, which may hereafter issue upon applications or inventions by party of the first part, so long as this agreement is in force.

"12. Party of the first part hereby guarantees to be the sole owner free from all incumbrances of above mentioned patents and patent applications.

"13. Party of the second part shall have the right hereunder to bring suit for infringement by others and any recovery of damages thereunder shall be solely the property of the second party.

"14. Party of the second part agrees to keep a good and sufficient record of any and all sales hereunder which record shall at any time be accessible to party of the first part or his legal representatives.

"15. It is understood that royalties hereunder shall accrue only upon those sales which have been paid for by the buyers thereof.

"16. It is understood that party of the second part shall in manufacture and sale hereunder render an accounting of sales

provisions therein clearly indicate that such was not the intention of the parties.

No notice was given by the defendant. On April 30, 1931, plaintiff, claiming the right so to do under the provision in paragraph 17, gave the defendant notice of cancellation for its failure to pay him the minimum royalties to which he claimed he was entitled under paragraph 5. He admits that he received from the defendant $300 every month until June 6th of that year. It is his claim that he accepted this money as compensation for the first year, ending in November, 1924, and thereafter as minimum royalties for the next two years as provided for in paragraph 5 and as applying on such royalties thereafter. It appears that nothing was said by either party at the end of the first, second, or third years about his employment or terminating the contract. The first action taken relative thereto

and collections hereunder to party of the first part every 90 days and remit royalties if any have accrued, at that time. It being understood that this clause has no reference to or bearing upon any guaranteed minimum royalty or payments hereunder.

"17. It is further understood that the failure of party of the second part to pay to party of the first part the guaranteed minimum royalty of $300 per month shall upon 30 days' notice by party of the first part to party of the second part, cancel this license and agreement, but shall not release party of the second part from payment of any accruals hereunder existing at that time.

"18. In witness whereof we have for ourselves, heirs, administrators, assigns and legal representatives, and in consideration of $1 in hand paid by party of the second part to party of first part, the receipt of which is hereby acknowledged as evidence of legal transfer of privileges as hereabove described, hereunto signed our hands and seals this 21st day of November, 1923.

"Party of the first part:

"WM. C. CARTER

"Party of the second part:

"MARVEL CARBURETOR COMPANY
   "By J. R. FRANCIS,
      "Secretary and Treasurer.

"Witnesses
   "D. D. FRANCIS
   "WM. H. ALEXANDER."

was plaintiff's letter of. April 30, 1931, above referred to.

It also appears that during this period of more than seven years the plaintiff was kept on the salary pay roll of the defendant, and that he received checks therefor semi-monthly during most of that time. He had an apartment or room in which he worked, and was engaged in no other work or business. If his employment ceased at the end of the first year, he would have had no right to the use of defendant's work-room thereafter, and naturally would have removed his equipment therefrom. A consideration of these facts, concerning which there is no dispute, leads us to conclude that, having accepted monthly compensation for his services under paragraph 1 for all these years without complaint or remonstrance, the defendant had the right to assume that he was working thereunder, and his claim now made for minimum royalties under paragraph 5 should not be allowed.

The law seems to be well settled that when one enters into the employment of another for a definite term and continues to render the same service after the expiration thereof, it will be presumed that the employment is continued under the terms of the original contract, and that its provisions continue in force. This presumption may, of course, be rebutted. *Sines* v. *Superintendents of the Poor,* 58 Mich. 503; *Laughlin* v. *School-District No. 17,* 98 Mich. 523; *Reynick* v. *Allington & Curtis Manfg. Co.,* 179 Mich. 631. See, also, 39 C. J. p. 49, and cases cited in footnote, and annotation in L. R. A. 1918 C, page 706 *et seq.*

Was the plaintiff entitled to royalties on the sales made to the Hudson-Essex Company? The conclusion above reached as to plaintiff's employment

renders the provisions in paragraph 5 inapplicable on consideration of this question, as that paragraph applied only to defendant's rights to manufacture and sell the products of plaintiff's invention when not in its employ.

Paragraphs 2, 3, and 4 of the contract clearly provide for royalties payable to plaintiff in the manufacture and sale of carburetors under plaintiff's patents, and if those sold to the Hudson-Essex Company were so manufactured, and are within the terms of the contract, recovery may be had therefor. Defendant's counsel raise several objections to the allowance made by the court as above stated.

1. That the by-pass incorporated in these carburetors was not covered by plaintiff's patent issued on November 10, 1931, but was the by-pass invented by Kirby and assigned to defendant. A number of expert witnesses were called and examined on this question. The trial court found that plaintiff's patent was used in the manufacture of this by-pass. It will serve no useful purpose to discuss the testimony in this respect. It is in most part highly technical, and not easily understood except by a patent expert. In our opinion, it supported the claim of the plaintiff and warranted the finding made.

2. That, even though the by-pass was covered by plaintiff's patent, no liability attached, for the reason that his patent was not granted until after the sales were made and after plaintiff's letter of April 30, 1931, canceling the contract, had been sent to defendant. As before stated, plaintiff filed an application for this patent on October 17, 1927, but the patent was not granted until November 10, 1931. Reliance is placed upon paragraph 8. The main purpose of this provision would seem to be to limit

plaintiff's rights to royalties to his own inventions and to those for which he had made application for patent after January 1, 1920.

Paragraph 10 assumes to state the understanding of the parties relative to these royalties. While applications for patents are not "issued" by the patent office, the intent of this provision would seem to be to provide for a royalty on articles manufactured under patents issued and patents applied for and subsequently issued. It is a well-known fact, of which we may take judicial notice, that articles are manufactured and sold after a patent has been applied for and before it has been granted, and this court has held that a contract so providing is enforceable. *Hamilton* v. *Park & McKay Co.,* 112 Mich. 138.

The language used in the first paragraph clearly indicates the purpose of the agreement in this respect. The defendant felt that it was dealing with an inventive genius. It desired to secure the right to use all patents that had been issued to him and all that should be issued while the agreement was in force. Under the proofs submitted and the finding of the trial court, it began making the carburetors containing the by-pass after plaintiff's application for a patent was made therefor in 1927, and the sales on which plaintiff claims royalties were made in 1928, 1929, 1930, and up to June 1, 1931.

While this contract was not carefully prepared, and contains some conflicting provisions, in our opinion it should be construed so as to entitle plaintiff to royalties on all articles manufactured and sold by the defendant in which the devices covered by the patents issued to plaintiff were used. Had he not continued in the employ of defendant, he

would have been entitled to the minimum royalties provided for in paragraph 5 of the contract, but, having so continued, his rights thereto are controlled by the other provisions referred to.

3. Counsel for the defendant also urge that no liability attached to it for the reason that the contract was canceled on June 1, 1931, and plaintiff's patent was not issued until November 10th of that year. In the fourth paragraph of its answer to plaintiff's amended bill of complaint, defendant said:

"Defendant admits that on or about May 2, 1931, plaintiff notified this defendant of the cancellation of said contract, but avers that said contract was not subject to cancellation for the reason that the defendant was not in default under the terms of the contract."

These dates are in conflict, and neither of them seems to be correct. The letter from the plaintiff assuming to cancel the contract is dated April 30, 1931, and it was said therein that it would be effective 30 days after its receipt by the defendant. The bill of complaint, filed on August 28, 1931, prayed for a cancellation of the contract. Defendant in its answer thereto denied "that plaintiff is entitled to any of the relief prayed for in his bill of complaint." The decree entered canceled the contract. It was stated therein that the defendant had no objection thereto.

It clearly appears that plaintiff had no right of cancellation when he wrote the letter above referred to. The defendant alone, under paragraph 1, might do so. The letter of cancellation was ineffective, as such right was claimed under paragraph 5, which we have held was inoperative, owing to his continued employment. In the bill of complaint he

seeks an accounting "both for the devices and articles manufactured and for those the sale of which defendant refused to allow." It is upon the first of these claims that the court found he was entitled to recover, and the accounting was made, as before stated. The amount allowed does not seem to be disputed if recovery may be had therefor.

Having concluded that the contract was not canceled by any act of either of the parties, the question of infringement is not involved. Whether the by-pass used by defendant in the manufacture of the carburetors sold to the Hudson-Essex Company was covered by plaintiff's application for patent, and which was afterwards issued to him, or was the invention of Kirby, raised an issue of fact triable in the circuit court (*Perfection Socket Co.* v. *American Forging & Socket Co.*, 222 Mich. 396), which, as before stated, was resolved in plaintiff's favor.

The decree is affirmed. Both parties having appealed, no costs will be allowed.

McDonald, C. J., and Fead and Wiest, JJ., concurred with Sharpe, J.

Butzel, J. The wording of the contract and the subsequent conduct of the parties show clearly that no royalties of any kind were due plaintiff at the time of the cancellation or thereafter. The terms were formulated by plaintiff and by defendant corporation, acting through its treasurer, who died prior to the hearing of the case. The crude manner in which the agreement was drawn is largely responsible for the difficulties in the present case.

The term of employment specified in the contract was only one year, during which time it was subject to cancellation upon 30 days' notice. It provided for a salary of $300 per month throughout that

year.   Paragraph 5 enabled defendant to retain the exclusive right to manufacture and sell devices patented by plaintiff even though it should choose to dispense with his services, but in the latter event defendant was obliged to pay plaintiff a minimum royalty of $300 per month for two years, $4,000 the third year, and $5,000 each year thereafter during such time as it made use of plaintiff's patents.

Plaintiff remained with defendant from November 21, 1923, until June 6, 1931, a period of over seven and one-half years, during which time he accepted payment of $300 per month, apparently working under the same terms as those which existed during the first year of employment.   Except for a statement made by him on re-cross examination, at the end of his testimony and after very lengthy examination and cross-examination, there is nothing in his testimony to indicate that any dissatisfaction was shown by him while accepting the amount paid him nor that any demand for more was made at any time during the entire period of over seven and one-half years.   His duties remained substantially the same throughout this entire time. He was working in defendant's factory on a carburetor and heat control.   One of defendant's engineers, Charles Kirby, was also experimenting with a similar device and filed an application for letters patent on October 5, 1927.   Plaintiff filed his application on October 17, 1927, amending clauses 7 and 13 in the application respectively in 1929, and again in 1931, after he had severed his relationship with defendant.   These two clauses of the patent application were deemed by plaintiff's expert witness, Otto Berry, to be of the greatest importance.   The patent was issued to plaintiff on November 10, 1931, several months after defendant

had ceased selling any carburetors containing the device covered by plaintiff's patent.

Plaintiff suggests two possible theories or measures of recovery. He asserts a right existed to collect minimum royalties under paragraph 5, hereinbefore mentioned, until such time as the total royalties exceeded the minimum guaranteed. Paragraph 5, however, seems to have been drafted only to cover a situation that would arise if defendant discharged plaintiff but desired to retain the exclusive rights to manufacture and sale of the devices patented by him. Plaintiff further claims that he was entitled to two per cent. gross royalties on all the carburetor and heat control units sold by defendant as soon as the royalties exceeded the stated minimum, despite the fact that the patent did not issue until the sale of these units had ceased. In the event that recovery of gross royalties is denied, he advances another alternative. He asserts that there still remains a right to the minimum royalties stipulated by paragraph 5 for the entire period of his employment with the exception of the first year. This is a payment in addition to the salary he has already received.

It is elementary that an inventor has no monopoly on his invention prior to the issuance of a patent. Until then, anyone may use it with impunity. *Kirk* v. *United States,* 163 U. S. 49 (16 Sup. Ct. 911); *Marsh* v. *Nichols, Shepard & Co.,* 128 U. S. 605 (9 Sup. Ct. 168). The inventor is entitled to a monopoly on his patent device for a term of 17 years. It is a well-known fact that an application frequently remains in the patent office for a very long period before a patent is granted. This interval is not a part of the 17 years during which the patentee enjoys the exclusive control of his device. Until the

patent is issued, royalties can be recovered only by virtue of an express contract. The trial judge recognized this limitation, but held that, notwithstanding the fact that plaintiff was not entitled to any royalties until the patent had been issued, the contract gave him retroactive rights to such royalties upon the issuance of the particular patent here involved. In other words, as soon as the patent was issued, there arose a right to collect royalties on all sales made during the interim between the filing of the application and the grant. The contract does not provide for any such payments.

The fact that the testimony is almost negligible that plaintiff made any claim to royalties of any kind during the time that defendant was using the device is almost conclusive that the parties considered plaintiff's original contract of employment as one that continued from year to year and that neither believed that plaintiff was entitled to any royalties for sales made prior to the issuance of the patent. Examination of the contract further confirms this conclusion.

It will be noted that paragraphs 1, 2, 3, 4, 7, 8, and 10 of the contract, all refer to patents and in no manner to unpatented inventions. We call particular attention to paragraph 10, which states:

"It is understood that royalties hereunder are to be based upon described patents already issued to party of the first part and aforesaid patent applications after same have issued."

Had plaintiff believed himself entitled to minimum royalties after the first year, or to gross royalties after they exceeded the guaranteed minimum, it seems incredible that he would have remained silent until the bringing of this suit.

There is considerable dispute as to whether plaintiff or defendant's employee, Kirby, invented the by-pass. I see no reason to dispute the conclusion of the trial judge that the by-pass was plaintiff's invention.

For the reasons hereinbefore stated, plaintiff was not entitled to royalties of any kind from defendant. The bill of complaint should be dismissed, with costs to defendant, and without prejudice to plaintiff's right to recover the very small amount he claims was wrongfully deducted from his salary for insurance premiums.

CLARK, POTTER, and NORTH, JJ., concurred with BUTZEL, J.